# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CORNUCOPIA INSTITUTE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.: 16-148 (RC) |
| v. | : | |
| | : | Re Document Nos.: 28, 29 |
| UNITED STATES DEPARTMENT OF | : | |
| AGRICULTURE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

In early 2013, The Cornucopia Institute ("Cornucopia") requested records from the Agricultural Marketing Service ("AMS"), a component of the United States Department of Agriculture ("USDA"), primarily regarding visits in 2012 by officials from the USDA's National Organic Program ("NOP") to organic dairies in Texas and New Mexico. Unsatisfied with the agency's response, Cornucopia brought this Freedom of Information Act ("FOIA") lawsuit. Presently before the Court are the parties' cross-motions for summary judgment, which concern the propriety of AMS's withholding of certain portions of responsive records under FOIA Exemptions 4 and 5. For the reasons explained below, the Court concludes that the agency has justified the vast majority of its withholdings. Accordingly, as to all records except for photographs taken during the Texas and New Mexico trip——which AMS must disclose—the Court grants the agency's motion for summary judgment and denies Cornucopia's motion for the same.

## II. BACKGROUND

In January 2013, Cornucopia submitted a FOIA request to AMS seeking, "information regarding visits to organic dairies in Texas and New Mexico by Matthew Michael, the Director of the NOP's Compliance and Enforcement Division, and Deputy Administrator Miles McEvoy, or any other USDA official or agent acting at NOP's request." Def.'s Statement of Material Facts as to Which There is No Genuine Issue ("Def.'s SMF") ¶ 1, ECF No. 28.[1] Cornucopia also sought materials related to any other dairies that were "visited directly by NOP staff in 2012." Def.'s SMF ¶ 1. In May 2013, AMS sent an interim response to Plaintiff, releasing a batch of responsive documents, with redaction of some responsive material. Def.'s SMF ¶ 3. AMS also indicated that additional responsive records would be forthcoming. Def.'s SMF ¶ 3. On various occasions between October 15, 2014 and October 7, 2015, Cornucopia requested updates regarding the status of the FOIA request, and, after each request for a status update, AMS informed Cornucopia that it was still processing records for the FOIA response. *See* Def.'s SMF ¶¶ 4–7. AMS also noted that it had contacted certain dairies to determine whether the responsive records contained any business confidential information. *See* Def.'s SMF ¶ 5; Compl. ¶ 19, ECF No. 1; *see also* Predisclosure Notification Procedures for Confidential Commercial Information, Exec. Order No. 12600, 52 Fed. Reg. 23, 781 (June 23, 1987) (requiring notice to submitters of confidential commercial information whenever an agency determines that it may be required to disclose that information under FOIA and requiring an agency to give the submitter an

---

[1] All citations to Defendant's Statement of Material Facts as to Which There is No Genuine Issue reflect facts that Cornucopia does not dispute. *See* Pl.'s Statement of Material Facts to Which There is No Genuine Issue, & Response to Def.'s Statement of Material Facts to Which There is No Genuine Dispute ¶ 1, ECF No. 30-1.

opportunity to object to disclosure).  Displeased with the delay, Cornucopia filed this lawsuit in January 2016.  *See* Def.'s SMF ¶ 8; Compl. ¶ 24–26.

Since Cornucopia filed this suit, AMS has provided a total of 4,254 pages of responsive records, with portions of certain records redacted under FOIA Exemptions 4, 5, and 6.  *See* Mem. of L. in Supp. of Def.'s Mot. Summ. J. ("Def.'s MSJ") at 1, 11–45, ECF No. 28; *see also* Def.'s SMF ¶ 11.  Most of the responsive records for which AMS has asserted FOIA exemptions relate to visits by NOP Deputy Administrator McEvoy and Director Michael to six organic dairy operations—Aurora Organic Dairy; Boehning Dairy, LLC; Redland Dairy; Hilltop Dairy, LLC; Native Pastures Dairy; and Natural Prairie Dairy Farm, LLC—between July 24 and July 27, 2012.  *See* Def.'s SMF ¶¶ 60–61.  According to AMS, the main purposes of the July 2012 trip were to assess the implementation of a pasture rule by accredited certifying agents ("ACAs")— non-agency entities that are accredited by the USDA to issue certificates to organic operations that comply with USDA organic regulations, Def.'s SMF ¶ 32—and by ruminant operations, and to evaluate how a 2012 drought was impacting operators.  Def.'s SMF ¶ 60.  While touring the organic dairy farms, officials also evaluated, among other things, how the organic dairy farms were sourcing replacement heifers and how farms and dairy processors were coordinating sanitizer use of bulk milk trucks.  Def.'s SMF ¶ 60.

In preparing to tour the six dairies, AMS obtained records that are responsive to Cornucopia's FOIA request.  Many records were either created by the dairies themselves as part of the process of obtaining certification from an accredited certifying agent or were created by an ACA as part of the same certification process.  *See* Def.'s SMF ¶ 62.  For each of the six dairy operations, AMS received the operation's organic system plans, or OSPs.  *See* Def.'s SMF ¶ 62.  An OSP—which, according to AMS, serves as "the foundation of the organic certification

process," Def.'s SMF ¶ 34—contains detailed information about all stages of an operation's production process. *See* Def.'s SMF ¶ 34–35; *see also* 7 U.S.C. § 6502(13) (defining "organic plan" as "a plan of management of an organic farming or handling operation . . . that includes written plans concerning all aspects of agricultural production or handling described in this chapter including crop rotation and other practices as required under th[e] chapter"). ACAs use OSPs to determine whether an organic operation has complied with statutory requirements and qualifies for organic labeling. *See* Def.'s SMF ¶ 35. According to AMS, OSPs are specific to each organic operation and describe in detail the operation's business model. *See* Def.'s SMF ¶ 36. In addition to OSPs, AMS obtained records such as the dairies' respective applications for organic certification, correspondence between the dairies and ACAs responsible for assessing them, inspection reports developed by the ACAs and attachments to those reports, the ACAs' inspection findings, and organic certificates issued by the ACAs. *See* Def.'s SMF ¶ 62 (listing which types of documents AMS received about each dairy operation). AMS received input from the six affected organic dairies, objecting to the disclosure of certain information in AMS's possession as both confidential business information and trade secret information. *See* Def.'s SMF ¶¶ 9–25.

Aside from materials created by the dairies or by ACAs, AMS identified internal agency records as responsive to Cornucopia's FOIA request, including email correspondence, an itinerary for the Texas and New Mexico trip, a trip report and drafts of that report, and photographs taken during the trip. Def.'s SMF ¶ 63. With respect to Cornucopia's request for records regarding other visits by NOP staff to dairies in 2012, AMS identified as responsive certain audit plans and cost estimates generated by AMS's Audit, Review, and Compliance

Branch; NOP certification file review worksheets; NOP witness audit checklists; external AMS email communications; and an OSP of another dairy operation.[2] *See* Def.'s SMF ¶ 64.

Cornucopia does not challenge the adequacy of AMS's search,[3] and does not contest any redactions pursuant to FOIA Exemption 6. However, Cornucopia questions the appropriateness of certain of the AMS's redactions under FOIA Exemptions 4 and 5. The parties' cross-motions for summary judgment are now ripe for the Court's review.

## III. LEGAL STANDARD

The Freedom of Information Act, or FOIA, "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)); *see also Judicial Watch v. U.S. Dep't of Defense*, 847 F.3d 735, 738 (D.C. Cir. 2017) ("Congress enacted FOIA to give the public 'access to official information long shielded unnecessarily from public view.'"). The Act mandates release of properly requested federal agency records unless the materials fall squarely within one of nine statutory exemptions. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2011) (citing 5 U.S.C. § 552(a)(3)(A), (b)).

---

[2] Unlike the six previously mentioned dairy operations, this dairy operation did not object to the release of information that might otherwise be protected under a FOIA exemption. *See* Def.'s SMF ¶¶ 26–27.

[3] Cornucopia's cross-motion for summary judgment initially challenged the adequacy of the AMS's search, arguing that it had failed to follow up on known leads that might have uncovered additional responsive records. *See* Pl.'s Mem. Supp. Mot. Summ. J. at 5–8, ECF No. 30. However, AMS has provided evidence of follow-up actions, and Cornucopia apparently agrees that AMS has satisfied its search obligations. *See* Pl.'s Reply, ECF No. 33; Def.'s Supp. Reply to Pl.'s Reply in Supp. of Pl.'s Renewed Mot. for Summ. J. at 1–2, ECF No. 35.

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing

*Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  The agency is

entitled to summary judgment if no material facts are genuinely in dispute and the agency

demonstrates "that its search for responsive records was adequate, that any exemptions claimed

actually apply, and that any reasonably segregable non-exempt parts of records have been

disclosed after redaction of exempt information."  *Competitive Enter. Inst. v. EPA*, 232 F. Supp.

3d 172, 181 (D.D.C. 2017).  "This burden does not shift even when the requester files a cross-

motion for summary judgment because 'the Government ultimately has the onus of proving that

the documents are exempt from disclosure,' while the 'burden upon the requester is merely to

establish the absence of material factual issues before a summary disposition of the case could

permissibly occur.'"  *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted)

(quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

To carry its burden, the agency must provide "a relatively detailed justification,

specifically identifying the reasons why a particular exemption is relevant and correlating those

claims with the particular part of the withheld document to which they apply."  *Elec. Privacy

Info. Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data

Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).  "[T]he government

cannot justify its withholdings on the basis of summary statements that merely reiterate legal

standards or offer 'far-ranging category definitions for information.'"  *Citizens for Responsibility

& Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v.

U.S. Dep't of Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987)).  A court will endorse an agency's

decision to withhold records if the agency's justification for invoking a FOIA exemption

"appears 'logical' or 'plausible.'" *Pinson v. U.S. Dep't of Justice*, 245 F. Supp. 3d 225, 239 (D.D.C. 2017) (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).  Nonetheless, "exemptions from disclosure must be narrowly construed . . . and conclusory and generalized allegations of exemptions are unacceptable." *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (citation and internal quotation marks omitted).

## IV.  ANALYSIS

The cross-motions for summary judgment presently before the Court concern the appropriateness of AMS's invocation of FOIA Exemptions 4 and 5 to shield portions of records responsive to Cornucopia's request for information primarily regarding visits by officials from the USDA's NOP to organic dairies in Texas and New Mexico in July 2012.  *See* Def.'s MSJ at 13–45; Pl.'s Mem. Supp. Mot. Summ. J. at 9–25, ECF No. 30 ("Pl.'s MSJ).  As explained below, the Court concludes—contrary to Plaintiff's objections—that the agency has provided logical and plausible bases for most of its withholdings under FOIA Exemptions 4 and 5, that the agency has provided detailed justifications supporting its segregability determinations, and that *in camera* review of the disputed documents in not warranted in this case.  Accordingly, except as to the photographs taken during the Texas and New Mexico trip—which AMS must disclose— the Court grants Defendant's motion for summary judgment, and denies Plaintiff's cross-motion for the same.

### A.  FOIA Exemption 5

Citing FOIA Exemption 5's deliberative process privilege, AMS has withheld portions of four categories of records: (1) the Texas and New Mexico Trip Report and drafts of that report, (2) photographs from the Texas and New Mexico trip, (3) two intra-agency email correspondence, and (4) NOP witness audit checklists.  *See* Def.'s MSJ at 13–20.  Cornucopia

contends that, with respect to each of the categories except for the NOP witness audit checklists, AMS has failed to show that the material withheld under the deliberative process privilege relates "to any specific agency decision making process, as opposed to a general fact gathering investigation by the agency's site visits to various organic farm facilities." Pl.'s MSJ at 11. As explained below, the Court concludes that AMS has satisfied its burden of showing that it properly invoked the deliberative process privilege to withhold three of the four categories of disputed records. However, AMS has not met its burden of showing that photographs from the Texas and New Mexico trip are properly withheld under the deliberative process privilege.

FOIA Exemption 5 shields "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). "To qualify, a document must . . . satisfy two conditions: its sources must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n* ("*Klamath*"), 532 U.S. 1, 8 (2001). "Exemption 5 'incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant'—including the presidential communications privilege, the attorney-client privilege, the work product privilege, and the deliberative process privilege—and excludes these privileged documents from FOIA's reach." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006)).

In this case, AMS invokes the deliberative process privilege, which "protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated.'" *Loving*, 550 F.3d at 38 (quoting

*Klamath*, 532 U.S. at 8). The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government[.]" *Klamath*, 535 U.S. at 8–9 (internal citations and quotation marks omitted). The privilege "helps to prevent premature disclosure of proposed policies and protects against public confusion through the disclosure of documents suggesting reasons for policy decisions that were ultimately not taken." *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 258–59 (D.D.C. 2004).

"To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis in original). A record qualifies for withholding only if it is both "predecisional" and "deliberative[.]" *Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). "A document is predecisional if it is 'generated before the adoption of an agency policy.'" *McKinley v. FDIC*, 744 F. Supp. 2d 128, 138 (D.D.C. 2010) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Records are "deliberative" if they reflect "the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. "[T]o come within the privilege and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C. Cir. 1975). The key question in determining whether the material is deliberative "is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at 1195 (quoting *Dudman Commc'ns Corp. v. U.S. Dep't of Air Force*, 815 F.2d 1565, 1567–68 (D.C. Cir. 1987)). To meet its burden, an

"agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of the Commonwealth of P.R. ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States Gas Corp.*, 617 F.2d at 868). However, an agency need not "identify a specific decision in connection with which a memorandum is prepared." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18. Rather, the agency must show that "the document was generated as part of a definable decision-making process." *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011).

AMS has satisfied its burden of showing that three of the four categories of records for which it has asserted the deliberative process privilege—all categories except for photographs taken during the Texas and New Mexico trip—qualify for protection. The first category of records is the Texas and New Mexico Trip Report and drafts of that report. *See* Def.'s MSJ at 15. AMS explains that the Texas and New Mexico Report arose out of NOP Deputy Administrator McEvoy and former Director Michael's July 2012 trip to six dairies in Texas and New Mexico. *See* Def.'s MSJ at 15. The purposes of that trip were to determine how effectively ACAs and organic ruminant operations were implementing an NOP pasture rule; to decide whether NOP needed to modify the pasture rule; and to evaluate how a 2012 drought was impacting operators. *See* Def.'s MSJ at 15; Def.'s Reply at 16. Upon returning from the trip, at the direction of the NOP Deputy Administrator McEvoy and former Director Michael, AMS employees created the Trip Report, which, according to AMS, set out then-current opinions and assessments on myriad issues. *See* Def.'s Reply at 16.

AMS contends that it has redacted opinions and assessments from the report by AMS employees regarding (1) whether specifically identified operations visited during the trip were

able to meet NOP regulations, including the NOP pasture rule, due to drought conditions; (2) the accuracy of operators' interpretations of the pasture rule and opinions regarding how NOP might clarify what the pasture rule requires; (3) the effects on the temporary variances NOP had issued to ruminant livestock producers in 2011; (4) whether the organic producers were complying with regulations concerning sanitizer use in bulk milk trucks; (5) how effectively organic producers were sourcing replacement livestock and whether NOP regulations regarding replacement livestock were being accurately interpreted; (6) whether the organic producers that NOP visited were complying with USDA organic regulations concerning approved sanitizers for milk trucks; (7) whether the NOP regulations regarding milk parlors were being accurately interpreted; and (8) general assessments regarding the understanding of USDA organic regulations. Decl. of Gregory Bridges ("First Bridges Decl.") ¶ 19, ECF No. 28-2. AMS maintains that, at the time that the Trip Report was created, the agency had not reached any final determinations regarding any of these matters. *See* Third Decl. of Gregory Bridges ("Third Bridges Decl.") ¶ 9, ECF No. 31-1. Furthermore, the report and drafts of the report were passed between USDA NOP personnel. *See* Vaughn Index at 163–68, Michael Decl. Attachment 14, ECF No. 28-1.

Contrary to Plaintiff's argument, the Court concludes that AMS has shown that the Texas and New Mexico Trip Report and drafts of that report were generated as part of several definable decisionmaking processes. According to AMS, the report, which was commissioned by NOP Deputy Administrator McEvoy and former Director Michael, offered AMS employees' assessments regarding, among other things, whether certain dairies were accurately interpreting USDA organic regulations and whether operators were complying with certain regulations. The report—and prior drafts of the report—are predecisional because the agency had yet to officially adopt any approach to or take any position on the issues that were addressed in the report. *See*

11

Third Bridges Decl. ¶ 9; *see also In re Anthem, Inc. Data Breach Litig.*, 236 F. Supp. 3d 150, 161 (D.D.C. 2017) ("'Developing a position on actions that another decision-maker might take is workaday agency business, not nefarious government activity, and opinions meant to contribute towards that deliberative process' are privileged (quoting *ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp. 2d 130, 135 (D.D.C. 2008)); *see also, e.g.*, *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) (concluding that draft agency history was covered by the deliberative process privilege regardless of whether the draft evolved into a final document). Likewise, the report is deliberative because it describes findings from the Texas and New Mexico trip and assesses how the agency may proceed in light of those findings. *See Hall & Associates LLC v. EPA*, 315 F. Supp. 3d 519, 538 (D.D.C. 2018) ("The draft status is a significant feature of [the disputed] records, because the D.C. Circuit has specifically held that the deliberative process privilege covers, *inter alia*, 'draft documents' that 'reflect the personal opinions of the writer rather than the policy of the agency.'" (quoting *Coastal States*, 617 F.2d at 866)). The agency need not point to any more specific decisionmaking processes to satisfy its burden of showing that FOIA Exemption 5 properly applies. *See Sears, Roebuck & Co.*, 421 U.S. at 151 n.18 ("Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions[.]"); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't Homeland Sec.*, 514 F. Supp. 2d 36, 46–47 (D.D.C. 2007) (finding that "documents consist[ing] of reports regarding various problems relating to the *ongoing* response to [Hurricane] Katrina and *suggesting* solutions and approaches and *draft* situation reports" qualify for protection under the deliberative process privilege) (emphasis in original).

The second category of documents for which AMS has cited the deliberative process privilege is photographs captured during the Texas and New Mexico trip. *See* Def.'s MSJ at 16. According to AMS, the photographs were taken to assist with the processes of assessing, among other things, how effectively the ACAs and organic ruminant operations were implementing the NOP pasture rule, how the 2012 drought was impacting operators, and whether operators understood and were following USDA regulations. *See* Def.'s MSJ at 15–16. Though factual in nature, AMS argues that the photographs are protected by the deliberative process privilege because the decision of what images to capture reflects what information certain agency decisionmakers perceived as important during the trip. *See* Def.'s Reply at 17. To reveal the images would offer insight into the inputs that were used to make decisions within the agency. *See* Def.'s Reply at 17.

The Court finds that AMS has not shown that the photographs are properly shielded by the deliberative process privilege. Under this Circuit's "functional approach" to the deliberative process privilege, "the legitimacy of withholding does not turn on whether the material is purely factual in nature . . . , but rather on whether the selection or organization of facts is part of an agency's deliberative process[,]" *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011). "Under this functional approach, an agency may not rely on the deliberative process privilege unless, if disclosed, the factual information would reveal something about the agency's deliberative process or if the factual information is inextricably intertwined with the deliberative sections of documents." *Hardy v. ATF*, 243 F. Supp. 3d 155, 165 (D.D.C. 2017) (internal quotation marks and citations omitted). AMS contends that the photographs were taken for the express purpose of aiding the agency in evaluating, among other things, whether dairies understood and were complying with agency regulations and how the

2012 drought was impacting operators. *See* Def.'s Reply at 16–17. And AMS suggests that in determining what to capture on camera during the trip, agency employees made value judgments about what material might be useful in their several decisionmaking processes. *See id.* But this Court is not persuaded that photographs taken under such circumstances necessarily qualify for protection under the deliberative process privilege.

First, the Circuit rejected a similar argument for protection of factual information included in a report in *Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931 (D.C. Cir. 1982). In that case, an agency argued that the deliberative process privilege shielded, in its entirety, a report prepared by agency personnel because the report "reflect[ed] the choice, weighing, and analysis of facts by the task force" and "the very narration of the facts . . . reflect[ed] the evidence selected and credited." *Id.* at 935 (internal quotation marks and citations omitted). The Circuit disapproved of blanket application of the deliberative process privilege, explaining that "[a]nyone making a report must of necessity select the facts to be mentioned in it; but a report does not become part of the deliberative process merely because it contains only those facts which the person making the report thinks material." *Id.* "If this were not so, every factual report would be protected as part of the deliberative process." *Id.*

The same considerations that led the Circuit to reject the arguments in *Playboy Enterprises* apply as to the photographs at issue in this case. It cannot be that the mere act of taking a photograph—an act during which the photographer necessarily elects to capture only certain images—alone renders the photograph part of the deliberative process. That AMS employees captured only certain images during the Texas and New Mexico trip and that those images played some unspecified role in the agency's decisionmaking processes does not suffice to show that the deliberative process privilege applies. *Cf., e.g., Hardy*, 243 F. Supp. 3d at 171–

73 (finding that the deliberative process privilege did not cover electronic survey data that an agency had argued would reveal "what information was reliable and relevant to the findings in a final report.").

Second, AMS offers no indication that the disputed photographs might be the sort of factual information to which courts in this district have applied the deliberative process privilege. AMS does not argue, for example, that the disputed photographs were culled from a larger subset of photographs and presented to a decisionmaker for use in any decisionmaking process. *Cf. Montrose Chem. Corp. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974) ("The work of the assistants in separating the wheat from the chaff is surely just as much part of the deliberative process as is the later milling by running the grist through the mind of the administrator."). Indeed, AMS fails to explain—other than in broad and vague terms—the role that these photographs played in any decisionmaking process. *Cf. Hardy*, 243 F. Supp. 3d at 168 (explaining that "[w]hether the deliberative process privilege applies is necessarily 'dependent upon the individual document and the role it plays in the administrative process'" (quoting *Coastal States*, 617 F.2d at 867)). Likewise, AMS's submissions offer no indication of why the release of these disputed photographs might reveal anything about the agency's deliberative processes. Because it appears, based on the submissions before the Court, that the photographs taken during the Texas and New Mexico trip are factual in nature and because AMS has failed to articulate how release of the photographs might allow inquiry into agency decisionmakers' thought processes, the Court concludes that AMS must release the photographs.

The third category of documents that AMS contends is covered by the deliberative process privilege are correspondence between AMS employees. *See* Def.'s MSJ at 16. Specifically, AMS redacted portions of two emails under the deliberative process privilege. *See*

Def.'s MSJ at 16.  One email included "pre-decisional opinions on the effects of the 2012 drought on a producer's operation."  *See* Def.'s MSJ at 16.  The email was created before NOP determined its course of action regarding how to address the effects of that drought.  *See* Michael Decl. ¶¶ 76–80.  The second email featured "pre-decisional assessments of how a producer was sourcing livestock and whether this method would be in compliance with future NOP regulations."  Def.'s MSJ at 16.  AMS asserts that release of materials from these emails could have a chilling effect on discussions among NOP personnel.  *See* Def.'s MSJ at 19.

Based on AMS's submissions, it is clear that both emails contain predecisional, staff opinions and assessments regarding matters under consideration by the agency.  Such documents are precisely what the deliberative process privilege is designed to shield.  *See Coastal States*, 617 F.2d at 866 (noting that the deliberative process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency"); *see also Access Reports*, 926 F.2d 1195 ("The 'key question' in identifying 'deliberative' material  is whether disclosure of the information would 'discourage candid discussion within the agency.'" (quoting *Dudman Commc'ns Corp.*, 815 F.2d at 1567–68)).  The Court disagrees with Plaintiff's contention that AMS has failed to establish that these emails relate to any specific decisionmaking process.  Indeed, AMS's submissions make abundantly clear what processes each email concerned.  *See* Def.'s MSJ at 19.  AMS need not identify any more specific decisions or decisionmaking processes to which the materials relate to justify its invocation of the deliberative process privilege.  *See Access Reports* (explaining that appropriateness of withholding materials under the deliberative process privilege "does *not* 'turn[] on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared" (quoting *Sears, Roebuck*

*& Co.*, 421 U.S. at 151 n.18)); *see also Public Emps for Envtl. Responsibility v. Office of Sci. & Tech. Pol'y*, 881 F. Supp. 2d 8 (D.D.C. 2012) (concluding that "the absence of . . . specific information" linking deliberative materials to "specific decisions" was "not fatal to [an agency] privilege claims, especially given the Working Group's advisory nature and the likelihood that it would deliberate and examine many proposals without arriving at specific decisions for each proposal").

The final category of records for which AMS has invoked the deliberative process privilege is NOP witness audit checklists. *See* Def.'s MSJ at 19–20. AMS has redacted observations and information that the NOP auditors believed important to the evaluation of whether particular ACAs should be accredited to inspect and to certify operations as organic. *See* Def.'s MSJ at 19–20. AMS contends that release of this information could chill internal agency communications between NOP auditors and their supervisors and might discourage full and frank discussion of whether an ACA should be accredited. *See* Def.'s MSJ at 20. Plaintiff does not dispute that the redactions to this category of documents are appropriate under the deliberative process privilege. *See* Pl.'s MSJ at 11. The Court agrees. AMS has explained that it redacted the impressions and opinions of agency staff members regarding whether to accredit certain entities. These materials are predecisional because they relate to the specific process of whether to offer accreditation to a prospective ACA, and they are deliberative because they reflect the give-and-take of the process of determining whether a prospective ACA is worthy of accreditation. Accordingly, the Court finds that AMS has met its burden with respect to this category of documents.

## B.  FOIA Exemption 4

Having assessed AMS's Exemption 5 withholdings, the Court next considers AMS's

withholdings under FOIA Exemption 4.  FOIA Exemption 4 authorizes agencies to withhold

documents that contain "trade secrets and commercial or financial information obtained from a

person and privileged or confidential."  5 U.S.C. § 552(b)(4).  "Unlike many other types of

information subject to an agency's control, materials implicating Exemption 4 are generally not

developed within the agency."  *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 148 (D.C. Cir. 2006).

Instead, the agency typically has procured the "information from third parties, either by

requirement or by request."  *Id.*  "If the requested documents constitute 'trade secrets,' they are

exempt from disclosure, and no further inquiry is necessary."  *Pub. Citizen Health Research Grp.*

*v. FDA*, 704 F.2d 1280, 1286 (D.C. Cir. 1983).  But, where documents instead constitute

"commercial or financial information," records are exempt from disclosure only if they are "(1)

commercial or financial, (2) obtained from a person, and (3) privileged and confidential."  *Id.* at

1289–90.

AMS has withheld four broad categories of information pursuant to FOIA Exemption 4:

(1) the identities of sourcing inputs; (2) protocols, procedures, and processes used in organic

dairy production; (3) farm descriptions and facility descriptions; and (4) production output

information.  *See* Def.'s MSJ at 23.  AMS contends that materials that fall within the first three

categories—that is, all categories except for production output information—qualify for

protection as trade secrets.  *See* Def.'s MSJ at 24–31.  And AMS argues that, regardless of

whether the disputed materials are protected as trade secrets, all four categories of records are

shielded under FOIA Exemption 4 as confidential business information.  *See* Def.'s MSJ at 32–

44.  Plaintiff disputes the applicability of FOIA Exemption 4 to the disputed documents, arguing

that (1) AMS has improperly asserted FOIA Exemption 4 to withhold documents for which disclosure is compelled by law, and that (2) even if disclosure of certain materials is not mandated by law, AMS has not carried its burden of showing that disclosure of materials such as OSPs and certification of compliance analyses is likely to cause substantial competitive harm. *See* Pl.'s MSJ at 22–25; Pl.'s Reply at 8–15.  As explained below, the Court disagrees with Plaintiff on both fronts and concludes that AMS has substantiated its withholdings under FOIA Exemption 4.

### 1.  Plaintiff Has Not Shown That Any Conflicting Statutory Scheme Bars the Agency from Relying on FOIA Exemption 4

Before addressing whether AMS has met its burden of showing that the disputed documents qualify as trade secrets and/or business confidential records that are protected by FOIA Exemption 4, the Court first considers Plaintiff's contention that Exemption 4 cannot shield certain disputed records because the agency has a duty under a different statute to disclose those records to the public.  *See* Pl.'s MSJ at 22–25.  Plaintiff asserts that the Organic Foods Production Act of 1990, 7 U.S.C. § 6501, *et seq.*, mandates that the agency "provide public access to certification documents and laboratory analyses that pertain to certification."  Pl.'s MSJ at 22–23 (quoting 7 U.S.C. § 6506(a)(9)).  According to Plaintiff, this provision dictates that "at a minimum, the OSPs" and "'any analyses that pertain' to ongoing compliance with the OSPs . . . are expressly not confidential under Exemption (b)(4), as a matter of law."  Pl.'s MSJ at 23 (quoting 7 U.S.C. § 6506(a)(9)).

AMS disagrees that the law compels disclosure of the disputed records.  The agency argues that 7 U.S.C. § 6506(a)(9) is ambiguous on the question of what records qualify as "certification documents and laboratory analyses that pertain to certification."  Def.'s Reply at 3.  Citing agency regulations—namely, 7 C.F.R. § 205.504(b)(5)—and *Chevron, U.S.A., Inc. v.*

*Nat'l Res. Def. Council*, 467 U.S. 837, 845 (1984), AMS asserts that its interpretation of the requirement as not reaching the records that are disputed in this case is entitled to deference. *See* Def.'s Reply at 3–12. In response, Plaintiff maintains that the statutory language is plain, not ambiguous, and that it mandates disclosure of certain disputed records. *See* Pl.'s Reply at 9–13.

The Court need not wade into the parties' arguments about what documents qualify as "certification documents and laboratory analyses" under the Organic Foods Production Act to address whether AMS is precluded from relying on FOIA Exemption 4. In *Environmental Integrity Project v. E.P.A.*, 864 F.3d 648 (D.C. Cir. 2017), the D.C. Circuit explained that a later-enacted statutory scheme that appears to mandate disclosure of certain documents does not inexorably prevail over FOIA exemptions. *See id.* at 649. Rather, "Section 559 of Title 5 provides that FOIA exemptions apply unless a later statute expressly supersedes or modifies those exemptions." *Id.* Thus, courts must first ask whether a statute that appears to conflict with a FOIA exemption was enacted after the FOIA exemption. *See id.* If the non-FOIA statutory scheme is the later statute, courts must determine whether that statute expressly supersedes or modifies FOIA. *See id.*

Here, the provision of the Organic Foods Production Act that Plaintiff cites does not expressly foreclose the agency's reliance on FOIA Exemption 4. FOIA Exemption 4 was enacted in 1967, *see id.*, while the Organic Foods Production Act was enacted in 1990, *see* 7 U.S.C. § 6501. Thus, the Court must examine the language of the Organic Foods Production Act for language that expressly supersedes Exemption 4. The relevant provision states that "[a] program established under this chapter shall . . . provide for public access to certification documents and laboratory analyses that pertain to certification." 7 U.S.C. § 6506(a)(9). The statute features no mention of FOIA and no suggestion that Congress intended to supersede any

FOIA exemptions.  *Cf. Envtl. Integrity Project*, 864 F.3d at 649 (describing statutory schemes

that expressly supersede FOIA exemptions).  Accordingly, the Court concludes that Section

6505(a)(9) of the Organic Foods Production Act does not expressly supersede Exemption 4 of

FOIA.  Even assuming that the statutory schemes are in tension with one another, the cited

provision of the Organic Foods Production Act does not preclude AMS from relying on FOIA

Exemption 4 to shield the disputed documents.

### 2. Trade Secrets

Having rejected Plaintiff's contention that AMS cannot rely on FOIA Exemption 4 due to

a supposedly conflicting statutory disclosure requirement, the Court next considers whether the

disputed records qualify as trade secrets that are protected by FOIA Exemption 4.  AMS

contends that three categories of redacted records—(1) protocols, procedures, and processes used

in organic dairy production; (2) farm descriptions and facility descriptions; and (3) production

output information—are exempt from disclosure under FOIA as "trade secrets."  *See* Def.'s MSJ

at 24.  Other than arguing that the disputed records are not properly regarded as confidential—an

argument that this Court rejected above—Plaintiff does not dispute AMS's assertion that the

disputed records qualify as trade secrets.  *See* Def.'s Reply at 13 (observing that "Plaintiff

ignores that, in addition to being redacted as confidential business information, information was

also redacted as a trade secret.").  The Court concludes that all three categories of redacted

records qualify as trade secrets under FOIA Exemption 4.

For FOIA purposes, a trade secret is "a secret, commercially valuable plan, formula,

process, or device that is used for the making, preparing, compounding, or processing of trade

commodities . . . that can be said to be the end product of either innovation or substantial effort."

*United Techs. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 563 n.9 (D.C. Cir. 2010) (alteration

in original) (quoting *Pub. Citizen Health Research Grp.*, 704 F.2d at 1288). Trade secret information must relate to the production process itself. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 150–51 (explaining that *Public Citizen* "narrowly cabins trade secrets to information relating to the 'productive process' itself").

AMS first contends that the protocols, procedures, and processes used in organic dairy production qualify as trade secrets. *See* Def.'s MSJ at 24–28. Among the many records falling within these categories are records offering information about the dairy operations' pest and weed management processes; information about livestock conversion processes; information about herd health monitoring processes; and information about irrigation processes. *See* Def.'s MSJ at 25–26. AMS explains that NOP regulations do not prescribe exactly the protocols, procedures, and processes that are to be used by organic dairy operations and that the protocols, procedures, and processes selected by a particular dairy operation are the end product of either innovation or substantial effort and contain each dairy's strategic approaches to organic production. *See* Def.'s MSJ at 25–27. The Court regards AMS's justifications as logical and plausible and finds that these records qualify as trade secrets exempt from disclosure.

AMS next asserts that the "sourcing inputs" used in the organic dairy production qualify as trade secrets. *See* Def.'s MSJ at 29–30. Sourcing inputs are the products utilized by organic dairies in the production process. *See* Def.'s MSJ at 29. AMS contends that this information— which includes details about, among other things, feed sources, seed sources, and sanitation and input sources—qualifies as trade secret material because the sourcing inputs utilized by a particular facility are not proscribed by agency regulations, but are instead developed through an iterative process by each dairy operation. *See* Def.'s MSJ at 29. AMS also states the decision of what sourcing inputs a dairy operation will utilize is the end product of sustained innovation and

substantial efforts and that information regarding these inputs is maintained in confidence and commercially valuable. *See* Def.'s MSJ at 29–30. Again, AMS's justifications—which Plaintiff does not challenge—strike this Court as logical and plausible. *See* Def.'s MSJ at 30. Accordingly, the Court also endorses AMS's withholding of information regarding sourcing inputs as protected trade secrets. *Cf., e.g.*, *People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Human Servs.*, 2018 WL 4000478, at *3–7 (D.C. Cir. Aug. 17, 2018) (protecting under Exemption 4 information about the importation of nonhuman primates, including "shipment-by-shipment quantity, crate size, and airline carrier information" because release of such "information would cause substantial harm to the competitive position of each importer"); *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1026 (D.C. Cir. 1999) (holding that disclosure of the "nature, cost, profit margin, and origin" of certain shipments would likely cause substantial competitive injury to importers).

Finally, AMS contends that farm and facility descriptions qualify as trade secrets. *See* Def.'s MSJ at 30–31. According to AMS, design choices made by organic dairies regarding farm and facilities take into consideration factors such as how to optimize use of farm space, efficiency in the movement of cattle from one part of the dairy to another, compliance with NOP regulations, and the safety and welfare of animals. Def.'s MSJ at 31. AMS claims that farm and facility layouts are selected and developed based on years of research, planning, innovation, and testing, and that knowledge of these layouts is commercially valuable information. Def.'s MSJ at 31. Furthermore, AMS asserts that farm and facility descriptions are maintained in confidence. The Court regards AMS's justifications as logical and plausible, and therefore, concludes that materials within this category are protected as trade secrets under FOIA Exemption 4. *Cf., e.g.*, *Forest Cty. v. Potawatomi Cmty. v. Zinke*, 278 F. Supp. 3d 181, 199–206

(D.D.C. 2017) (concluding that Exemption 4 protected, among other things, a "description of gaming facilities" and "projected size and phasing of [a particular] [f]acility" featured in a disputed report).

### 3. Confidential Business Information

Finally, the Court examines whether the remaining disputed records are protected from disclosure under FOIA Exemption 4 as confidential business information. To show that records qualify as confidential business information protected by Exemption 4, an agency must establish that the withheld records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Pub. Citizen Health Research Grp.*, 704 F.2d at 1290. AMS contends that four categories of records qualify as confidential business information—(1) the identities of sourcing inputs; (2) protocols, procedures, and processes used in organic dairy production; (3) farm descriptions and facility descriptions; and (4) production output information. *See* Def.'s MSJ at 32. Because this Court has already determined that three of the four categories are exempt from disclosure as trade secret information, the Court need only consider whether the final category—production output information—qualifies as confidential business information. *See Petrucelli v. Dep't of Justice*, 51 F. Supp. 3d 142, 163 n.9 (D.D.C. 2014) (noting that, because withheld information was protected under one FOIA exemption, the court "need not consider [the applicability of another exemption] separately with respect to the same information" (citing *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011))). Plaintiff does not dispute that the production output information is commercial or financial. Nor does Plaintiff question whether the information was "obtained from a person." *See* Pl.'s MSJ at 24–25. But Plaintiff does challenge whether the records qualify as privileged or confidential.

*See* Pl.'s MSJ at 25.  The Court concludes that AMS has carried its burden of demonstrating that the redacted production output information is covered by Exemption 4.

Though Plaintiff does not challenge whether the redacted production output information is commercial or financial and whether the records were obtained from a person, the Court nonetheless briefly considers these issues to confirm that the agency has carried its burden.  First, to determine whether information is "commercial" or "financial," courts in this district give these words their ordinary meanings.  *See Wash. Post Co. v. HHS*, 690 F.2d 252, 266 (D.C. Cir. 1982).  As a general matter, records are "commercial" or "financial" so long as the submitter of the information has a "commercial interest" in them.  *See Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  The D.C. Circuit has given "commercial interest" a broad definition; it includes records that "reveal basic commercial operations," "relate to the income-producing aspects of a business," or bear upon the "commercial fortunes" of an organization.  *Id.* (internal quotation marks and citations omitted).  Here, the Court has no doubt that the production output information qualifies as information in which the submitters have some "commercial interest."  According to AMS, these records reveal each dairy's production capabilities and sales information.  *See* Def.'s MSJ at 43–44.  Competitors "could use that information to determine the dairy's ability to service new or expanding customers and use that against the dairy in the bidding process."  Def.'s MSJ at 43.  Based on this explanation, the Court has little trouble concluding that this information bears directly upon the commercial fortunes of the dairies.

Second, the Court also concludes that the information in question was obtained from a person.  A "person" under FOIA, includes "an individual, partnership, corporation, association, or public or private organization other than an agency[.]"  5 U.S.C. § 551(2).  Information

generated by the federal government itself is not "obtained from a person" for purposes of Exemption 4.  *See Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 404 (D.C. Cir. 1980).  According to AMS, the information that it has redacted as business confidential records were obtained either through documents submitted by the dairy operations to the ACAs or obtained by the ACAs through inspections.  *See* Def.'s MSJ at 33.  Neither the dairy operations nor the ACAs are government entities.  *See* Def.'s SMF ¶ 32.  Plaintiff makes no argument that this information might fall short of meeting the statutory condition.  *See generally* Pl.'s MSJ.  Accordingly, the Court finds that AMS has satisfied this requirement.

Finally, the Court must address whether the production output information is confidential.  In this Circuit, courts apply different standards to allegedly confidential records based on whether the information in question was furnished voluntarily to the Government or whether the Government required its submission.  *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878–80 (D.C. Cir. 1992) (en banc).  Where, as here, the Government compelled submission of the information, *see* Def.'s MSJ at 35 (acknowledging that dairies are required to submit certain information about their business operations for inspection purposes), courts ask whether "disclosure of the information is likely . . . (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) (footnote omitted).

AMS argues that both the "impairment prong" and the "competitive harm prong" are met here with respect to production output information.  According to AMS, "dairies provide this information and allow for inspections with an expectation that Confidential Business Information will not be disclosed publicly or to their competitors."  Def.'s MSJ at 35.  AMS speculates that

"public disclosure of proprietary information w[ould] discourage participation in the NOP

Organic Program[.]" Def.'s MSJ at 35. AMS also contends that disclosure of this production

output information would cause substantial harm to the competitive positions of the respective

dairies, meeting the "competitive harm" prong. *See* Def.'s MSJ at 43–45; Def.'s Reply at 13–14.

The Court concludes that AMS has shown that the "competitive harm prong" is met.[4]

Courts "'need not conduct a sophisticated economic analysis of the likely effects of

disclosure' to decide if substantial competitive harm would occur." *Ctr. for Digital Democracy*

*v. FTC*, 189 F. Supp. 3d 151, 161 (D.D.C. 2016). Instead, an agency may present "evidence

revealing actual competition and the likelihood of substantial competitive injury . . . to bring

commercial information within the realm of confidentiality." *Id.* (internal quotation marks and

citation omitted). Importantly, the D.C. Circuit has explained that courts "generally defer to the

agency's predictive judgments as to 'the repercussions of disclosure.'" *United Techs. Corp. v.*

*U.S. Dep't of Def.*, 601 F.3d 557, 563 (D.C. Cir. 2010) (quoting *McDonnell Douglas Corp. v.*

*U.S. Dep't of the Air Force*, 375 F.3d 1182, 1191 n.4 (D.C. Cir. 2004)). Still, conclusory

statements about competitive harm are insufficient. *See Occidental Pertrolum Corp. v. SEC*, 873

F.2d 325, 342 (D.C. Cir. 1989).

Here, AMS states that production output information "would provide competitors with a

clear picture of the dairy's' [sic] production capabilities," including actual and expected

production output, operational acreage, number of cows on-site and information about the cows'

output capabilities, pasture sizes, and stocking rates. *See* Def.'s MSJ at 43. Competitors could

use this information to "determine the dairy's ability to service new or expanding customers and

---

[4] Because the Court finds that AMS has demonstrated that the "competitive harm prong"
is met, the Court need not consider AMS's arguments regarding the "impairment prong."

use that against the dairy in the bidding process." Def.'s MSJ at 43. Competitors might also use information about production capabilities to attempt to poach customers by, for example, offering to produce the same amount of organic dairy for a lower rate. Def.'s MSJ at 43–44.

Plaintiff baldly asserts that AMS has "failed to meet its burden of demonstrating competitive harm in the present action." Pl.'s MSJ at 25. The Court disagrees. The D.C. Circuit has explained that "competition in business turns on the relative costs and opportunities faced by members of the same industry," and, accordingly, "there is a potential windfall for competitors to whom valuable information is released under FOIA." *Worthington Compressors, Inc. v. Castle*, 662 F.2d 45, 51 (D.C. Cir. 1981). In line with this observation, courts in this district have found likelihood of competitive harm due to the disclosure of otherwise-private pricing information. *See, e.g.*, *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1188–90 (D.C. Cir. 2004) (finding that disclosure of a company's option year prices would likely cause it substantial competitive harm by informing the bids of its rivals in the event that the contract was rebid). The Court finds that AMS has presented sufficient evidence that the dairies face actual competition and that disclosure of information regarding the dairies' respective productive output would likely cause competitive harm.

In sum, the Court concludes that AMS has properly applied FOIA Exemption 4 with respect to all four categories of disputed documents.

### C. Segregability

Before approving an agency's withholdings, a court has an affirmative duty to ensure that the agency has released "[a]ny reasonably segregable portion of [an otherwise exempt] record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b); *see also Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999). A court errs if it

"simply approve[s] the withholding of an entire document without entering a finding on segregability or the lack thereof." *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (quoting *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 744 (9th Cir. 1979)). Here, Plaintiff argues that, with respect to redactions under both Exemption 4 and Exemption 5, AMS has failed to show that it has released all reasonably segregable, nonexemption information. *See* Pl.'s MSJ at 12–14, 16–22; Pl.'s Reply at 7–8, 14–15. Plaintiff relies primarily on the notion that many of the partially released records do not feature information that Plaintiff regards as useable. *See* Pl.'s MSJ at 17–21. Plaintiff asks this Court to review certain disputed documents *in camera* to confirm that AMS has released all reasonably segregable portions of exempt records. The Court concludes that AMS has adequately explained that all segregable information has been provided and only exempt information was redacted, meeting its segregability obligations. Thus, the Court finds that there is no need to review the disputed documents *in camera*.

Segregability is assessed under a burden-shifting framework. "In order to demonstrate that all reasonably segregable material has been released, the agency must provide a 'detailed justification' for its non-segregability." *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc.*, 566 F.2d at 251). "However, the agency is not required to provide so much detail that the exempt material would be effectively disclosed." *Id.* To make this showing, the agency typically provides a *Vaughn* index and "a declaration attesting that the agency released all segregable material." *Judicial Watch, Inc. v. DOJ*, 20 F. Supp. 3d 260, 277 (D.D.C. 2014). Once this information is provided, the agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). The plaintiff must then

produce a "quantum of evidence" to rebut this presumption, at which point "the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld." *Id.*

In response to Plaintiff's contentions that AMS had failed to release segregable information, AMS has provided very comprehensive explanations, describing the types of record redacted and specifying the exact information that was redacted from the records. *See* Def.'s Reply at 19–43. AMS further explains that it went through the disputed documents line-by-line to confirm that all non-exempt material has been released. *See* Def.'s Reply at 27, 35–37, 39, 41–43. Where AMS has redacted factual information, it has explained that such information is intertwined with exempt information and, thus, is not segregable. *See, e.g.*, Def.'s Reply at 36–37, 42. Nonetheless, Plaintiff continues to assert baldly that records may contain segregable information. *See* Pl.'s Reply at 15. Contrary to Plaintiff's claims, the Court concludes that Defendant's very detailed submissions plainly satisfy its burden. *See Johnson*, 310 F.3d at 776 (concluding that an agency that had submitted "a comprehensive *Vaughn* index, describing each document withheld, as well as the exemption under which it was withheld" and that had supplied an additional affidavit on the issue of segregability, had met FOIA's segregability requirements). The Court also concludes that Plaintiff has not provided a "quantum of evidence" to rebut the presumption that the agency has complied with its obligations to disclose reasonably segregable material. *See Sussman*, 494 F.3d at 1117.

In light of the Court's determination that AMS has discharged all of its FOIA obligations, the Court finds that *in camera* review is unnecessary and, thus, denies Plaintiff's request for such review of specifically identified disputed documents. Trial courts are afforded broad discretion to "examine the contents of" requested records "in camera to determine whether such records or any part thereof shall be withheld." 5 U.S.C. § 552(a)(4)(B); *see also Spirko v. U.S. Postal Serv.*,

147 F.3d 992, 996 (D.C. Cir. 1998). But "district courts have substantial discretion" in deciding whether to review documents *in camera*. *See Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984). "The ultimate criterion is simply . . . [w]hether the district judge believes that in camera inspection is needed in order to make a responsible de novo determination on the claims of exemption." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978). Here, reviewing the claimed exemptions *de novo* and as explained above, this Court concludes that AMS's submissions contain sufficient detail to assess the applicability of the claimed FOIA exemptions. Accordingly, the Court concludes that *in camera* review is unwarranted.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**, and Plaintiff's cross-motion for summary judgment is **DENIED** as to all records except for the photographs taken during the Texas and New Mexico trip. With respect to those photographs, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's motion is **DENIED**.[5] An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 27, 2018                    RUDOLPH CONTRERAS
                                              United States District Judge

---

[5]  Defendant is not required to release any photographs that are protected by FOIA Exemption 4.